# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**TIMOTHY D. WALLENDER,**

    **Plaintiff,**

    **v.**                                        **Case No. 20-CV-808-SCD**

**ANDREW M. SAUL,**
**Commissioner of Social Security,**

    **Defendant.**

---

## DECISION AND ORDER

---

Timothy D. Wallender applied for Social Security benefits in 2017, alleging that he is disabled due to various physical impairments. Following a hearing, an administrative law judge (ALJ) denied benefits in 2019, finding that Wallender remained capable of working notwithstanding his impairments. Wallender now seeks judicial review of that decision, arguing that the ALJ erred in considering information relating to a different claimant, failing to consider the statement of his treating physician, and evaluating his alleged symptoms. The Commissioner contends that the ALJ did not commit a reversible error of law in reaching her decision and that the decision is otherwise supported by substantial evidence.

I agree that the ALJ committed reversible error in evaluating Wallender's allegations of disabling symptoms. Because this error may call into question the ALJ's findings at steps four and five, the decision denying Social Security benefits to Wallender will be reversed and this matter will be remanded for further proceedings.

# BACKGROUND

Wallender was born on January 31, 1975, in Kaukauna, Wisconsin. R. 184, 760.[1] He was adopted at a young age and raised in Fond du Lac by his adoptive family. R. 760. After graduating high school in 1994, Wallender got a machine-operating job in a die-cast factory. R. 66, 216, 760. In 2007, he was diagnosed with discoid lupus erythematosus. R. 680. The following year, he began experiencing cognitive issues after a serious motor vehicle accident. R. 760–71. Wallender was involved in another motor vehicle accident in 2014, this time injuring his shoulder and requiring surgery. R. 442. That same year, Wallender got a new job doing electronics and setup on construction trucks. R. 70, 216. He left that job after several months and later found a maintenance job at a local church, working about thirty hours a week. R. 64–65, 216. After a series of health issues, in September 2017 Wallender cut back his hours at the church to twelve per week. R. 51–53, 763.

Later that month, Wallender applied for disability insurance benefits from the Social Security Administration (SSA), alleging that he became disabled on September 15, 2017 (when he was forty-two years old). R. 13, 184–85. Wallender asserted that he was unable to work due to the following medical conditions: lupus, arthritis, diabetes, high blood pressure, shoulder injury, carpal tunnel, and hiatal hernia. R. 215. After his application was denied at the state-agency level by the Wisconsin Disability Determination Bureau, R. 78–110, Wallender requested an administrative hearing before an ALJ, R. 121–22. Wallender, along with his attorney, appeared via video before ALJ Roxanne J. Kelsey on July 16, 2019. R. 42–77.

---

[1] The transcript is filed on the docket at ECF No. 16-1 to ECF No. 16-11.

At the hearing, Wallender testified that he was living with his girlfriend at his elderly parents' house. R. 53. He helped with chores around the house—including carrying in groceries, occasionally mowing the lawn, and taking out the trash—and did his own cooking and cleaning. R. 53–55. Wallender reported that he was able to drive, that he went snowmobiling once a year, and that he didn't have any problems using his smartphone. R. 55–56.

At the time of the hearing, Wallender was still working part-time at the church cleaning baseboards, cleaning bathrooms, changing light bulbs, and doing touch-up paint jobs. R. 49–50. He stated that his responsibilities at the church were reduced significantly in 2017 after two trips to the emergency room for not "feeling well at all." R. 51. Around that time, Wallender was having issues with his blood pressure and blood sugar, he felt "run down" while working, and he was missing a lot of work due to doctor appointments with various specialists. R. 51–52. Because he was not feeling well or working as much, Wallender also wanted to cut back his hours so that he would qualify for health care coverage from the state. R. 52–53. But, according to Wallender, his health issues and numerous doctor appointments (fifty-two within one year of his 2017 emergency-room visit) prevented him from working full-time, notwithstanding any insurance issues. R. 51–52, 62–63. Wallender claimed that he was still able to work twelve hours per week at the church because his hours were flexible, essentially allowing him to complete his tasks whenever he felt up to it. R. 61.

Wallender testified that the biggest issue preventing him from working full-time in even a sit-down job was fatigue: "I just get tired and I get really run down." R. 53. He also reported experiencing pain in his "big joints"—ankles, knees, hips, shoulders, and elbows—that ranged from two or three out of ten to ten out of ten, depending on the day. R. 57. On days when he

3

wakes up with swollen joints, it can take up to thirty-five minutes to get loosened up and ready to get out of bed. *Id.* According to Wallender, he has "bad days" about four or five times per month, sometimes more, where he's unable to leave the house "unless it [is] an extreme emergency." R. 59. On a good day, he can lift about thirty pounds, stand for about forty-five to sixty minutes, and walk one to two blocks. R. 58–60. Wallender indicated that his hips go numb after standing or walking for prolonged periods, which he attributed to neuropathy or possibly his diabetes—he was not 100% certain as to the cause. R. 59. Wallender stated that he did not have much of a problem sitting, though his hips and knees will get stiff after a while. R. 60.

Theresa Kopitzke testified at the hearing as a vocational expert. *See* R. 68–76. Kopitzke testified that Wallender had past relevant jobs as a janitor (performed at the medium and heavy exertional levels), a motor vehicle assembler (heavy), and a die cast maker (heavy). R. 71. According to Kopitzke, a hypothetical person with Wallender's age, education, and work experience could perform the motor vehicle assembler job, as it is generally performed, if he were limited to a restricted range of medium work. R. 71. Kopitzke also provided several other medium (e.g., kitchen helper, industrial cleaner, and hospital cleaner) and sedentary (e.g., document preparer, telephone information clerk, and charge account clerk) jobs such an individual could perform. R. 71–73.

Applying the standard five-step process, *see* 20 C.F.R. § 404.1520(a)(4), on August 26, 2019, the ALJ issued a written decision concluding that Wallender was not disabled. *See* R. 10–41. At step one, the ALJ determined that Wallender had not engaged in substantial gainful activity since September 15, 2017, his alleged onset date. R. 15. At steps two and three, the ALJ found that Wallender's severe impairments—history of surgery, bilateral shoulders;

4

degenerative joint disease, bilateral hips; history of surgery, bilateral knees; minimal facet joint arthritis, lumbar spine; diabetes mellitus, type 2; discoid lupus erythematosus; obesity; neurocognitive disorder; major depressive disorder; and generalized anxiety disorder—limited his ability to work but didn't meet or equal the severity of a presumptively disabling impairment. R. 15–28.

The ALJ next determined that Wallender had the residual functional capacity to perform medium work with the following exertional limitations: he could occasionally lift fifty pounds; frequently lift and/or carry twenty-five pounds; stand and/or walk about six hours out of an eight-hour workday; and sit about six hours out of an eight-hour workday. R. 29. The ALJ further determined that Wallender could push/pull, except that he could only frequently reach overhead with either upper extremity. *Id.* As for nonexertional limitations, the ALJ determined that Wallender "lacks the ability to apply and carry out complex instructions because of moderate limitation in concentration, but retains the sustained concentration necessary for simple work of a routine type if given normal workplace breaks, meaning two 15-minute break after two hours of work and a 30-minute break mid-shift." *Id.* In assessing this RFC, the ALJ did not fully credit Wallender's subjective allegations of disabling symptoms. *See* R. 30–32.

At step four, the ALJ determined that, in light of the above RFC, Wallender could perform his past relevant job as a motor vehicle assembler, as that job is generally performed. R. 33. The ALJ alternatively determined at step five that Wallender could also work as a kitchen helper, an industrial cleaner, a hospital cleaner, a document preparer, a telephone information clerk, and a charge account clerk. R. 33–35. Based on those findings, the ALJ

determined that Wallender was not disabled between his alleged onset date and the date of the decision. R. 35.

After the SSA's Appeals Council denied review, *see* R. 1–5, making the ALJ's decision the final decision of the Commissioner of Social Security, *see Loveless v. Colvin*, 810 F.3d 502, 506 (7th Cir. 2016), Wallender filed this action on May 29, 2020. ECF No. 1. The matter was reassigned to me in June 2020 after all parties consented to magistrate-judge jurisdiction under 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73(b). *See* ECF Nos. 4, 6, 7. The matter is fully briefed and ready for disposition. *See* ECF Nos. 17, 25, 28.

## APPLICABLE LEGAL STANDARDS

"Judicial review of Administration decisions under the Social Security Act is governed by 42 U.S.C. § 405(g)." *Allord v. Astrue*, 631 F.3d 411, 415 (7th Cir. 2011) (citing *Jones v. Astrue*, 623 F.3d 1155, 1160 (7th Cir. 2010)). Pursuant to sentence four of § 405(g), federal courts have the power to affirm, reverse, or modify the Commissioner's decision, with or without remanding the matter for a rehearing.

Section 205(g) of the Act limits the scope of judicial review of the Commissioner's final decision. *See* § 405(g). As such, the Commissioner's findings of fact shall be conclusive if they are supported by "substantial evidence." *See* § 405(g). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Moore v. Colvin*, 743 F.3d 1118, 1120–21 (7th Cir. 2014) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)) (other citations omitted). The ALJ's decision must be affirmed if it is supported by substantial evidence, "even if an alternative position is also supported by substantial evidence." *Scheck v. Barnhart*, 357 F.3d 697, 699 (7th Cir. 2004) (citing *Arkansas v. Oklahoma*, 503 U.S. 91, 113 (1992)).

6

Conversely, the ALJ's decision must be reversed "[i]f the evidence does not support the conclusion," *Beardsley v. Colvin*, 758 F.3d 834, 837 (7th Cir. 2014) (citing *Blakes v. Barnhart*, 331 F.3d 565, 569 (7th Cir. 2003)), and reviewing courts must remand "[a] decision that lacks adequate discussion of the issues," *Moore*, 743 F.3d at 1121 (citations omitted). Reversal also is warranted "if the ALJ committed an error of law or if the ALJ based the decision on serious factual mistakes or omissions," regardless of whether the decision is otherwise supported by substantial evidence. *Beardsley*, 758 F.3d at 837 (citations omitted). An ALJ commits an error of law if his decision "fails to comply with the Commissioner's regulations and rulings." *Brown v. Barnhart*, 298 F. Supp. 2d 773, 779 (E.D. Wis. 2004) (citing *Prince v. Sullivan*, 933 F.2d 598, 602 (7th Cir. 1991)). Reversal is not required, however, if the error is harmless. *See, e.g.*, *Farrell v. Astrue*, 692 F.3d 767, 773 (7th Cir. 2012); *see also Keys v. Barnhart*, 347 F.3d 990, 994–95 (7th Cir. 2003) (citations omitted).

In reviewing the record, this court "may not re-weigh the evidence or substitute its judgment for that of the ALJ." *Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004) (citing *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003)). Rather, reviewing courts must determine whether the ALJ built an "accurate and logical bridge between the evidence and the result to afford the claimant meaningful judicial review of the administrative findings." *Beardsley*, 758 F.3d at 837 (citing *Blakes*, 331 F.3d at 569; *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001)). Judicial review is limited to the rationales offered by the ALJ. *See Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 93–95 (1943); *Johnson v. Apfel*, 189 F.3d 561, 564 (7th Cir. 1999); *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).

7

# ANALYSIS

Wallender contends that the ALJ erred in (1) considering evidence relating to a different claimant; (2) failing to consider a statement from his treating physician; and (3) rejecting his claims of disabling symptoms.

## I. The ALJ's Consideration of Extraneous Information

At step two of the sequential evaluation process, the ALJ determined that Wallender did not have a presumptively disabling mental impairment. R. 24–28. After analyzing the paragraph B criteria, including Wallender's ability to adapt and manage himself, the ALJ's decision contains the following paragraph:

> Regarding performance of activities of daily living, based on the claimant's responses in her *Function Report*, she was limited primarily by her physical impairments (Exhibit 6E). At one time, the claimant told the counselor she had become emotionally numb because her younger children were sick frequently, which prevented her from self-care time to address her own emotional and physical issues (Exhibit 25F, p. 21). She admitted that in the past taking such time would have made her feel "bad," but had recognized the need for it (*id.*). As was reported above, during the prior hearing the claimant testified that she was easily angered and could become argumentative with family, friends, and strangers. However, counseling session notes submitted for the current hearing found the claimant telling the counselor at different times that had used calming techniques or just controlled herself in situations where she would have "gone off" prior to starting counseling (*e.g.*, Exhibits 22F, p. 27 and 25F, p. 30). Even when the claimant was experiencing increased agitation and irritability as side effects from a new medication, the claimant controlled herself and avoided the physical altercation that she felt would have occurred (Exhibit 26F, p. 18).

R. 28. It appears this paragraph was inadvertently copied from a different claimant's decision; there is no dispute that the information and exhibits cited in this paragraph do not pertain to Wallender.

Wallender argues that the ALJ's consideration of evidence relating to another claimant is an error of law that requires remand. *See* ECF No. 17 at 9–13. Specifically, Wallender contends that remand is compelled by the SSA's Hearings, Appeals, and Litigation Manual

8

(HALLEX), which provides that an agency analyst will recommend the Appeals Council to voluntary remand a case if the Appeals Council either "erroneously relied" on "an exhibit or other document that forms part of the administrative record [that] appears to pertain (in whole or in part) to an individual other than the claimant" or "overlooked that the ALJ erroneously relied on the information." HALLEX § I-4-2-20(D), *available at* https://www.ssa.gov/OP_Home/hallex/I-04/I-4-2-20.html (last visited Feb. 25, 2021). Wallender maintains that the ALJ's consideration of this evidence was not harmless, as "[a] finding of a moderate (or marked) limitation in the area of adapting and managing oneself would have required consideration in the formulation of the RFC, perhaps with a restriction on workplace changes." ECF No. 17 at 12. The Commissioner argues that the guidance contained in the HALLEX is inapplicable here; that even if the guidance is applicable, it doesn't compel remand in this situation; and that any error by the ALJ in considering evidence relating to another claimant was harmless. *See* ECF No. 25 at 3–11.

I agree with the Commissioner that it appears doubtful HALLEX § I-4-2-20(D) is applicable here. That section of the manual governs the agency's handling of "Evidentiary Documents (Exhibits)." *See* HALLEX § I-4-2-20. Wallender does not allege that his administrative record contains any evidentiary documents or exhibits relating to another claimant. *See, e.g.*, ECF No. 17 at 10 ("The evidence regarding the referenced female claimant is not found in Wallender's file."). Rather, the only information pertaining to another claimant appears *in the ALJ's decision itself*. But the ALJ's decision is neither an evidentiary document nor an exhibit. Thus, HALLEX § I-4-2-20(D) does not seem to require remand when

9

information pertaining to another claimant appears in the ALJ's decision but nowhere else in the administrative record.[2]

Even if HALLEX § I-4-2-20(D) did apply here, that guidance would not compel remand in this case. Section (D) instructs an agency analyst to "consider the impact of the evidence on the defensibility of the case" and recommend remand only if the Appeals Council or the ALJ "erroneously relied on the information." *See* HALLEX § I-4-2-20(D). Here, there is no reason to believe that the Appeals Council relied on the information pertaining to the unknown female referenced in the ALJ's decision, and the ALJ's decision, read as a whole, demonstrates that she didn't rely on that information either.

The information in question appears immediately after the ALJ's analysis of the paragraph B criteria, namely paragraph B4, which required the ALJ to assess Wallender's ability to adapt or manage himself. *See* R. 24–28. The ALJ determined that Wallender had a mild limitation in this domain and explained the basis for this finding with citations to exhibits contained in the record. *See* R. 27. Wallender does not challenge any of this evidence. That paragraph concludes by stating, "As such, the claimant appears to be adequately able to manage his thoughts and adapt." *Id.* Thus, the information that follows about another claimant's daily activities does not appear to have played any role in the ALJ's paragraph B analysis. The lack of reliance by the ALJ here distinguishes our case from the out-of-district cases relied upon by Wallender. *See* ECF No. 17 at 11–12 (listing cases). The inclusion in the ALJ's decision of a single paragraph relating to another claimant was a harmless typographical error. *See Bauman v. Astrue*, No. 5:11-CV-00142-BG, 2012 U.S. Dist. LEXIS

---

[2] The reference in HALLEX § I-4-2-20(D) to "other document[s] that form[] part of the administrative record" appears to relate to additional evidence received by the Appeals Council that "it cannot consider in relation to the ALJ decision because the claimant does not meet one of the good cause exceptions set for the in 20 CFR 404.970(b) and 416.1470(b)." *See* HALLEX § I-4-2-20.

10

116988, at *21–22 (N.D. Tex. Apr. 30, 2012) (rejecting plaintiff's argument that a "single reference to evidence that presumably related to another claimant" required remand because all the other evidence cited by the ALJ related solely to the plaintiff).

To the extent the ALJ did err by relying on extraneous information relating to another claimant, this error was harmless, as Wallender has not presented any evidence to suggest that he was more limited mentally than the ALJ found. Wallender asserts that the ALJ would have needed to accommodate a moderate or marked limitation in adapting or managing himself in the RFC assessment. Maybe. But Wallender has not attempted to show that he had a moderate or marked limitation in that domain, and the evidence the ALJ cited that did pertain to Wallender supported her finding of only a mild limitation.[3] *See Jozefyk v. Berryhill*, 923 F.3d 492, 498 (7th Cir. 2019) (ruling any error in RFC harmless in part because plaintiff hypothesized no additional restrictions).

## II.    The ALJ's Failure to Consider Dr. Kraemer's December 2017 Statement

Matthew Kraemer, DO, was Wallender's primary care provider. *See* R. 325. During a visit on December 20, 2017, Wallender asked Dr. Kraemer to fill out a medical exemption from work form so that he could work twenty hours per week and maintain eligibility for food share benefits. R. 692. Wallender also explained that he planned to apply for disability benefits. *Id*. After summarizing Wallender's medical conditions, Dr. Kraemer stated,

> Between chronic issues that he deals with and their current condition it seems medically reasonable that a disability applies to him but he is not fully incapacitated. Limiting his work time to half time or 20 hours weekly is reasonable and would allow his medical issues to be treated appropriately and timely but also allow him to have some gainful employment.

---

[3] When assessing Wallender's RFC later in the decision, the ALJ did briefly address Wallender's daily activities, not those of the unknown female claimant mentioned at step three. *See* R. 31.

11

R. 692–93. Dr. Kraemer apparently filled out the form, *see* R. 693, but it is not included in the administrative record. The ALJ did not mention Dr. Kraemer's statement in her decision. *See* R. 13–36.

Wallender argues that the ALJ's failure to address Dr. Kraemer's December 2017 statement constitutes reversible error. *See* ECF No. 17 at 13–15. According to Wallender, Dr. Kraemer's statement is a "medical opinion" that the ALJ was required to consider under the framework of 20 C.F.R. § 404.1520c. *Id.* at 13–14. Even if not considered a medical opinion under the regulations, in Wallender's view the ALJ still erred in not addressing the statement "because an ALJ cannot simply ignore evidence contrary to her conclusion." *Id.* at 14. Wallender contends that this omission was not harmless, as Dr. Kraemer's statement, if accepted, would have precluded full-time work. *Id.* at 14–15. The Commissioner argues that Dr. Kraemer's December 2017 statement does not satisfy the regulatory definition of a medical opinion, that the ALJ did not ignore an entire line of evidence, and that Wallender has failed to show how consideration of Dr. Kraemer's statement would have affected the ALJ's RFC assessment. *See* ECF No. 25 at 19–21.

I agree with the Commissioner that Dr. Kraemer's December 2017 statement does not constitute a medical opinion, as that term is defined in the SSA's regulations. The regulations define a medical statement as

> a statement from a medical source about what you can still do despite your impairment(s) and whether you have one or more impairment-related limitations or restrictions in the following abilities: . . .
>
> > (i) Your ability to perform physical demands of work activities, such as sitting, standing, walking, lifting, carrying, pushing, pulling, or other physical functions (including manipulative or postural functions, such as reaching, handling, stooping, or crouching);

(ii) Your ability to perform mental demands of work activities, such as understanding; remembering; maintaining concentration, persistence, or pace; carrying out instructions; or responding appropriately to supervision, co-workers, or work pressures in a work setting;

(iii) Your ability to perform other demands of work, such as seeing, hearing, or using other senses; and

(iv) Your ability to adapt to environmental conditions, such as temperature extremes or fumes.

20 C.F.R. § 404.1513(a)(2).[4] Thus, to constitute a medical opinion under this regulation, Dr. Kraemer's statement must satisfy two elements: (1) it must be a statement from a medical source about what Wallender could still do despite his limitations; and (2) it must express Wallender's impairment-related limitations or restrictions in terms of his ability to perform certain work demands.

Dr. Kraemer's statement does not satisfy either element of § 404.1513(a)(2). First, I do not think his statement—which is contained within the "History of Present Illness" section of a treatment note—is a statement about Wallender's capabilities despite his impairments. Dr. Kraemer merely noted that it was "medically reasonable" to limit Wallender "to half time or 20 hours weekly" in the context of completing a medical-exemption-from-work form at Wallender's request so that he could maintain his eligibility for food share benefits. *See* R. 692. Although the actual form is not in the record, the treatment note indicates that Wallender was applying for the exemption to cap his work hours at twenty per week, and he needed his doctor's approval. *See id.* In other words, this was not a situation where Dr. Kraemer independently decided that Wallender was unable to work more than twenty hours a week. Rather, Dr. Kraemer simply signed off on the Wallender's pre-prepared application, noting

---

[4] The new regulations apply to Dr. Kraemer's statement, as Wallender's claim for benefits was filed after March 27, 2017. *See* 20 C.F.R. § 404.1513(a)(2).

13

that "it seems medically reasonable." *Id*. Second, even if the statement could fairly be characterized as a statement about what Wallender could still do despite his impairments, the treatment note does not assess any of the vocationally relevant functional limitations listed in the regulation. Dr. Kraemer's December 2017 statement therefore did not constitute a medical opinion, and the ALJ was not required to consider it under § 404.1520c.

Notwithstanding whether Dr. Kraemer's December 2017 statement is considered a medical opinion, the ALJ did not commit reversible error in failing to address it. "Although an ALJ need not mention every snippet of evidence in the record, the ALJ . . . may not ignore entire lines of contrary evidence." *Arnett v. Astrue*, 676 F.3d 586, 592 (7th Cir. 2012) (citations omitted). The ALJ here did not violate this rule. While the ALJ did not expressly mention Dr. Kraemer's statement, she did carefully and thoroughly consider the underlying medical conditions discussed by Dr. Kraemer, and she explained why those impairments did not warrant any limitations beyond the RFC she assessed. *See* R. 18–33. The ALJ also expressly considered that Wallender cut his hours back at work significantly after his alleged onset date. *See* R. 15. Moreover, when asked at the administrative hearing whether there were any medical source statements in the record, Wallender's counsel stated, "No I don't believe that there is one." R. 45–49. The ALJ therefore did not ignore an entire line of evidence contrary to her conclusion.

## III.    The ALJ's Evaluation of Wallender's Alleged Symptoms

ALJs use a two-step process for evaluating a claimant's impairment-related symptoms. *See* Social Security Ruling (SSR) 16-3p, 2016 SSR LEXIS 4, at *3 (Mar. 16, 2016). First, the ALJ must "determine whether the individual has a medically determinable impairment (MDI) that could reasonably be expected to produce the individual's alleged symptoms." *Id*.

14

at *5. Second, the ALJ must "evaluate the intensity and persistence of an individual's symptoms such as pain and determine the extent to which an individual's symptoms limit his or her ability to perform work-related activities." *Id.* at *9. "In considering the intensity, persistence, and limiting effects of an individual's symptoms, [the ALJ must] examine the entire case record, including the objective medical evidence; an individual's statements about the intensity, persistence, and limiting effects of symptoms; statements and other information provided by medical sources and other persons; and any other relevant evidence in the individual's case record." *Id.* at *9–10.

Reviewing courts "will overturn an ALJ's decision to discredit a claimant's alleged symptoms only if the decision is 'patently wrong,' meaning it lacks explanation or support." *Cullinan v. Berryhill*, 878 F.3d 598, 603 (7th Cir. 2017) (quoting *Murphy v. Colvin*, 759 F.3d 811, 816 (7th Cir. 2014)). "A credibility determination lacks support when it relies on inferences that are not logically based on specific findings and evidence." *Id.* "In drawing its conclusions, the ALJ must 'explain her decision in such a way that allows [a reviewing court] to determine whether she reached her decision in a rational manner, logically based on her specific findings and the evidence in the record." *Murphy*, 759 F.3d at 816 (quoting *McKinzey v. Astrue*, 641 F.3d 884, 890 (7th Cir. 2011)).

After summarizing Wallender's testimony, the ALJ here determined it was "reasonable to expect that [Wallender's] medically determinable impairments could cause [his] alleged symptoms," but found that Wallender's "statements concerning the intensity, persistence and limiting effects of [his] symptoms [were] not entirely consistent with the medical evidence and other evidence in the record." R. 29–30. The ALJ acknowledged that Wallender likely did experience some of "the symptom-related limitations to which he

15

testified." R. 30. However, according to the ALJ, Wallender's testimony concerning "the severity of symptoms and the functional limitations imposed on him by those symptoms" "was not persuasive." *Id.* The ALJ explained that a claimant cannot be found disabled simply because he "is unable to work without experiencing pain or other impairment-related symptom[s]." *Id.* Rather, "[t]here must be objective evidence that reasonably supports the extent of the limitations reported." *Id.* The ALJ then went on to provide specific examples of why she did not fully credit Wallender's alleged symptoms. *See* R. 30–32.

Wallender argues that the ALJ committed a series of errors when evaluating his subjective symptoms. *See* ECF No. 17 at 15–24. His main argument is that the ALJ committed an error of law in believing that the severity of Wallender's alleged symptoms had to be backed by objective medical evidence. *Id.* at 15–17. Social Security regulations and rulings require ALJs to consider objective medical evidence—that is, "evidence obtained from the application of medically acceptable clinical and laboratory diagnostic techniques"—when evaluating a claimant's alleged symptoms, including pain. *See* 20 C.F.R. § 404.1529(c)(2) (noting that objective medical "is a useful indicator to assist [the ALJ] in making reasonable conclusions about the intensity and persistence of [a claimant's] symptoms and the effect of those symptoms"); *see also* SSR 16-3p, 2016 SSR LEXIS 4, at *9–13. However, an ALJ may not "reject [a claimant's] statements about the intensity and persistence of [his] pain or other symptoms or about the effect [his] symptoms have on [his] ability to work *solely because the available objective medical evidence does not substantiate [his] statements*." § 404.1529(c)(2) (emphasis added); SSR 16-3p, 2016 SSR LEXIS 4, at *12–13 ("However, we will not disregard an individual's statements about the intensity, persistence, and limiting effects of symptoms solely because the objective medical evidence does not substantiate the degree of impairment-

16

related symptoms alleged by the individual."). This is because some pain and other symptoms——migraines, anxiety, fatigue—are often not subject to substantiation by objective evidence.

I agree with Wallender that the ALJ relied too heavily on the absence of objective support to discount Wallender's complaints of disabling symptoms. For several of Wallender's allegations, lack of objective support was the *sole* reason the ALJ rejected them. For instance, the ALJ disregarded Wallender's testimony that he experiences numbness in his legs while walking because "there was no evidence in the treatment record that showed actual diagnosis of neuropathy." R. 30. However, at the administrative hearing, Wallender was unsure as to the cause of his leg numbness:

> The doctor, at one time, I -- I don't remember the exact term he had for it. It was some -- I want to say neuropathy of some type or another. It may have been tied in with my diabetes. I'm -- and I'm not 100% certain. I -- I don't have the best memory.

R. 59. Given this uncertainty, the ALJ should have dug deeper to see whether Wallender's allegation was consistent with other evidence in the record. Or, there should have been some explanation as to why someone claiming to experience numbness would always be able to provide objective evidence of such. Similarly, the ALJ disregarded Wallender's testimony that it took him thirty-five minutes to loosen up before getting out of bed in the morning because "there was nothing in the record that provided a reason for such difficulty." R. 30.

The ALJ's reliance on lack of objective evidence is most problematic with respect to Wallender's alleged pain and fatigue. Wallender repeatedly reported fatigue to his medical providers, *see, e.g.*, R. 311, 327, 332, 351, 397, 509, 680, 770, and he testified at the administrative hearing that fatigue was the "biggest issue" inhibiting him from working full-time, R. 53. However, the ALJ did not probe further during the hearing, and her decision reflects little consideration of this crucial allegation. In fact, when assessing Wallender's RFC

17

and evaluating his alleged symptoms, all the ALJ had to say about fatigue was that "there was no objective evidence that presented diagnosed physical impairments that, even in combination would have limited the claimant to the degree he reported." R. 30. The ALJ's focus on the lack of objective evidence is especially troubling given the Seventh Circuit's caution that certain symptoms, like pain and fatigue, often cannot be measured through medical testing. *See, e.g.*, *Carradine v. Barnhart*, 360 F.3d 751, 753 (7th Cir. 2004); *Pierce v. Colvin*, 739 F.3d 1046, 1050 (7th Cir. 2014).

The Commissioner argues that the ALJ's citation of other evidence that undermines Wallender's allegations of fatigue, including the state-agency physician opinions and Wallender's daily activities, makes up for her overreliance on the lack of objective evidence. *See* ECF No. 25 at 24–25. This argument is unpersuasive for two reasons. First, although the state physicians purportedly considered Wallender's fatigue and still found him capable of medium work, *see* R. 87–89, 103–06, it's unclear whether the ALJ credited those portions of the physicians' opinions. The ALJ indicated that she found the state physicians' opinions "persuasive with regard to the need to limit how often [Wallender] reached overhead with either upper extremity." R. 32. However, according to the ALJ, "the complete record including [Wallender's] testimony, showed that [he] required more restrictive exertional limitations than either consultant had provided." *Id.*

Second, as the Commissioner acknowledges, the ALJ did not connect this evidence to Wallender's fatigue complaints. The ALJ did not mention fatigue when discussing the state-agency opinions. *See id.* As for Wallender's reported daily activities, the ALJ merely concluded that they "presented [Wallender] as quite functional." R. 31. However, she did not explain how these activities were inconsistent with Wallender's allegations of work-preclusive fatigue.

18

In contrast to the Commissioner's suggestion, the missing connection was not obvious, as the listed activities—which included helping his parents carry in groceries, mowing his parents' lawn, shopping, maintaining his bedroom, wheeling the trash can to the curb, and using his smart phone, *see* R. 31—could be done at Wallender's own pace, and none involved prolonged activity comparable to full-time work, *see, e.g.*, R. 54, 66 (Wallender testifying that he "occasionally" mows his parents' "small lot," which takes about an hour); R. 61 (Wallender testifying that he was able to work part-time at the church because his hours were flexible). The ALJ therefore failed to build an accurate and logical bridge between this evidence and her decision to reject Wallender's complaints of disabling fatigue.

The Commissioner also argues that the ALJ did not reject *all* of Wallender's statements based solely on the lack of objective evidence. *See* ECF No. 25 at 21–23. That's true. The ALJ explained how the evidence was inconsistent with Wallender's claimed limitations of limiting social activities due to the need to urinate frequently, suffering from disrupted sleep, and avoiding certain activities (like snowmobiling) due to vision problems. *See* R. 31. But this argument misses the point. Especially in comparison with Wallender's allegations of fatigue, those statements were non-issues. In fact, Wallender did not mention any of those impairments in his initial application, *see* R. 184–85, or during his administrative testimony, *see* R. 49–67.

Because I find that the ALJ committed reversible error in resting her subjective-symptom analysis too heavily on the absence of objective support, I will only briefly address Wallender's other arguments concerning his alleged symptoms. Wallender maintains that the ALJ exaggerated his allegation regarding the frequency of his "bad days." *See* ECF No. 17 at 21–22. He's right. The ALJ thought that Wallender claimed to suffer three or four bad days

19

per week. R. 29. Wallender's actual testimony was that he had four or five bad days *per month*, and sometimes more. R. 59. Viewed in isolation, this error likely would not be cause for remand. But it does support Wallender's argument that the ALJ erred in evaluating his subjective allegations. If the ALJ wrongly believed he was exaggerating how many bad days he experienced, that could have clouded her view of all of his testimony: *falsus in uno, falsus in omnibus.*

Finally, Wallender contends that the standard the ALJ used to evaluate his allegations was more stringent than the standard required by the law. *See* ECF No. 17 at 22–24. A few times in the decision, the ALJ seemed to require that Wallender's allegations be fully consistent with the record to be believed. *See* R. 30 (concluding that Wallender's allegations were "not entirely consistent with the medical evidence and other evidence in the record"); R. 33 (same). Other times, the ALJ recited the correct legal standard. *See* R. 29 (explaining that the ALJ considered the extent to which Wallender's symptoms "can reasonably be accepted as consistent with the objective medical evidence and other evidence"). To the extent that these standards are different, the ALJ should be mindful to use the correct one on remand.

**CONCLUSION**

For all the foregoing reasons, I find that the ALJ committed reversible error in evaluating Wallender's subjective allegations of disabling symptoms. Accordingly, the Commissioner's decision is **REVERSED**, and this action is **REMANDED** pursuant to sentence four of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), for further proceedings consistent with this decision. The clerk of court shall enter judgment accordingly.

**SO ORDERED** this 25th day of February, 2021.

STEPHEN C. DRIES
United States Magistrate Judge